In re José Ruiz de Val, Respondent.

No. 22. Argued February 9, 1931.—Decided March 28, 1932.

*R. A. Gómez, Fiscal* for the prosecution. *C. Coll y Cuchí* for respondent.

Mr. Justice Hutchison delivered the opinion of the Court.

Before contracting a third marriage, Luis Riefkohl· gave his fiancée, Lucía Morales, $40,000. Of this amount $34,000 passed into the hands of Tomás Morales, a brother of Lucía, who mortgaged a farm to secure the payment of promissory notes to that amount. These notes were made payable to bearer. Riefkohl and Lucía Morales executed an antenuptial notarial instrument styled *"Escritura de Capitulaciones Matrimoniales."* The purpose of this instrument, as set forth therein, was to identify the property owned by each of the prospective spouses. It· contained an inventory of the property owned by Riefkohl amounting in the aggregate to something over $200,000. In this instrument, Lucía Morales stated that she had no property of any kind, and that therefore she would bring nothing to the marriage. She also acknowledged the property inventoried as belonging to Riefkohl to be his separate property, and agreed that only the increase should become a part of the community property. It was also agreed that on dissolution of the marriage the capital contributed thereto by Riefkohl would be first paid and the remainder would be subject to distribution as community property.

When Riefkohl died he left an estate valued at something more than $300,000. In a last will and testament he had named Mrs. Riefkohl as one of his executors. His heirs challenged the validity of the $40,000 donation and asserted that the farm mortgaged by Tomás Morales, and the dairy managed by him, had been in fact the property of Riefkohl. Morales then executed a deed which purported a transfer of the

mortgaged property to his brother, Francisco Javier Morales, a teacher in the public schools. The notes and mortgage were canceled and four new notes, each for ten thousand dollars, were executed by the ostensible purchaser of the property and delivered to Mrs. Riefkohl. These notes were also made payable to bearer and were secured by a new mortgage executed by the said purchaser. The Riefkohl heirs then demanded the removal of Mrs. Riefkohl as an executor, on the ground that she was concealing or attempting to conceal property belonging to the estate.

Mrs. Riefkohl, represented by José Ruiz de Val as her attorney, was asserting her tittle to the $40,000 as her separate property and at the same time insisting upon her right as the surviving spouse to an usufruct and a share in the community property in addition to a legacy of $15,000 under the will. She severed her relations with Ruiz de Val and employed other counsel. These attorneys told her that they did not like the looks of the matter, that it was an ugly situation, and finally advised her that she should be content with the $40,000 and some $2,000 or more already received by her on account of the legacy. Upon this basis, a compromise of the controversy between the widow and the heirs was effected.

An attorney for two of the heirs, who had not joined in the motion for the removal of the executor but who were interested in the negotiations which followed, testified at the hearing that he regarded the result as a magnificent settlement, from the standpoint of the heirs. In a suit brought against Mrs. Riefkohl for the recovery of attorney's fees by Ruiz de Val, he testified that in his opinion Mrs. Riefkohl was entitled to recover forty or fifty thousand dollars, as her interest in the estate, in addition to the $40,000 presented to her before her marriage.

There is no doubt about the simulated character of the pretended conveyance by Tomás Morales to his brother, Francisco Javier Morales. All of the notarial instruments executed at the time of this simulated conveyance were drawn by Ruiz de

Val. His statement is that Tomás Morales and Mrs. Riefkohl consulted him about the proposed transfer, told him about the claim of the Riefkohl heirs concerning the true ownership of the property in question, and exhibited certain papers and correspondence bearing upon the merits of such claim; that after examining the documents so submitted, he concluded that the property belonged to Morales and advised him that a transfer was unnecessary, but Morales insisted and witness finally told him that the property was his and that he could do as he pleased with it; that witness advised Mrs. Riefkohl and Morales not to cancel the existing mortgage and promissory note but Mrs. Riefkohl insisted that if the property was to be transferred, a new mortgage should be executed to include accrued interest and other indebtedness and witness thought that no one could be defrauded as the result of the proposed transaction. In the suit for attorney's fees, Ruiz de Val also testified that Mrs. Riefkohl and Morales came to him for his opinion as to the advisibility of a transfer of the property in order to put it beyond the reach of the Riefkohl heirs; that witness told them that before making the transfer he would have to examine the evidence on which the claim of the Riefkohl heirs was based; that then they brought a large bundle of correspondence between Morales and Luis Riefkohl, certain statements of account and checks for large sums of money that had been cashed; that after a careful study of these documents witness reached the conclusion that a transfer of the property was unnecessary, especially as the notes payable to bearer and secured by a lien upon the property had been executed with the consent of Riefkohl; that witness informed and advised Morales that the fact that Riefkohl was a relative, had written him concerning the manner in which the business had been transacted, and had sent him statements of account—that what Riefkohl had invested in the business, and the profits earned, which (Riefkohl?) had said were all in the family, as Riefkohl was his father-in-law—and the fact that Morales had cashed checks given

him by Riefkohl did not signify that Morales was not the owner of the property, nor that the property belonged to the Riefkohl heirs; and that he told Morales a transfer was unnecessary, but Morales insisted.

The testimony of Mrs. Riefkohl, of Tomás Morales, of Mrs. Morales, and of the brother, Francisco Javier Morales, points persuasively to the conclusion that in executing the simulated conveyance, the new mortgage and new notes to the full amount of $40,000, they acted upon the advice of Ruiz de Val, given as the attorney of Tomás Morales and Mrs. Riefkohl. A statement contained in a letter written by Ruiz de Val when notified by Mrs. Riefkohl that his services as attorney would not be longer required is enough to dissipate any reasonable doubt in this regard. That statement, made long before the commencement of the present disbarment proceeding, was a reminder that Ruiz de Val had placed Tomás Morales and Mrs. Riefkohl under cover with respect to the alleged rights of the Riefkohls to the Sabana Llana property. Whether he advised and recommended such a course or acquiesced therein and cooperated with his clients in the capacity of a notary is a question of minor importance. In either case, he was guilty of misconduct that can not be ignored nor condoned when brought to the attention of this Court.

Shortly after the simulated transfer of the Sabana Llana dairy farm, Ruiz de Val received from Mrs. Riefkohl $5,000 for which, a day later, he gave a receipt which reads as follows:

"Received from Lucía Morales, the widow of Riefkohl, the sum of FIVE THOUSAND DOLLARS as fees for services in a personal matter of heirs in connection with the Estate of Luis Riefkohl Sandoz, deceased, wherein there is a controversy between the Riefkohl heirs and Mrs. Riefkohl (*la señora* Morales) as to the ownership of THIRTY-FOUR THOUSAND DOLLARS in notes secured by a mortgage on the property of Tomás S. Morales in Sabana Llana, Río Piedras; it being agreed that in consideration of said sum I bind myself to settle this matter in a manner satisfactory to her, that is, so that the said sum shall remain in her possession as her property and that she will not have to part with it.

"In connection with this matter I am at liberty to use the said sum in any case for the purpose of a compromise in any way in the said matter.

"Once the matter has been finally settled this document shall be returnd to me, to all of which I subscribe in Río Piedras, P. R., on the 19th of January, 1928."

Mrs. Riefkohl says that Ruiz de Val represented to her that he needed this money in order to consummate an agreement of compromise and settlement about to be reached; that the money was placed in the hands of Ruiz de Val for this purpose, not as compensation for his services as her attorney; that her brother, Tomás Morales, was in the States at the time and that she did not raise any question about the form of the receipt because she feared that a protest might offend her attorney and prejudice her interest in accomplishing the result which Ruiz de Val assured her was about to be reached. Tomás Morales says that his sister told him what had occurred and showed him the receipt on his return from the States and that he did not like the form of the receipt but advised his sister to await further development before making any protest.

Ruiz de Val refers to an alleged question as to certain items which might have resulted in the payment to the Riefkohl heirs of an amount varying according to the circumstances between one and four thousand dollars. His explanation is that he was to receive as compensation for his services five thousand dollars or the difference between five thousand dollars and any amount so paid. In a letter dated March 13, 1929, Mrs. Riefkohl says:

"Now, Mr. Ruíz de Val, I dislike suits and fights and in order to settle this matter I am willing to give you two thousand dollars, which is double the sum at which your services have been appraised, and in this way we may settle this matter forever. If you agree, you will return to me $3,000 from the five thousand which you know I delivered to you to collect your fees from, using the greater part, that is, from $4,000 to $4,600, in the compromise which you told me would perhaps be expedient to make in the settlement of matters between the heirs and myself."

When Ruiz de Val brought his action to recover $14,000 as compensation for legal services rendered by him, Mrs. Riefkohl filed a cross complaint for recovery of the $5,000. The district judge found that the $5,000 had been placed by Mrs. Riefkohl in the hands of her attorney for the purposes alleged in the cross complaint and rendered judgment in favor of Mrs. Riefkohl for the full amount of $5,000, and in favor of Ruiz de Val for the sum of $2,000 as the reasonable value of his services. An appeal from that judgment is now pending before this Court.

Whatever the result may be in the action to which we have just referred, the evidence adduced in the present proceeding, including the testimony of Ruiz de Val himself, shows that when Mrs. Riefkohl placed the $5,000 in his hands she understood that the greater part at least of that amount was to be used by him in settlement of the pending controversy with the Riefkohl heirs. The document wherein Ruiz de Val, on the day following delivery of the $5,000, acknowledged receipt thereof as attorney's fees came as an unpleasant surprise to his client. The testimony of Ruiz de Val falls far short of showing the existence of any actual need for the delivery of this money in anticipation of a possible settlement upon terms which would require the immediate payment of several thousand dollars. The evidence as a whole practically excludes any rational theory as to the existence of such necessity.

We are not satisfied, beyond a reasonable doubt, that Ruiz de Val by any direct misrepresentation of fact induced his client to part with the possession of the $5,000. In one way or another, however, he gave her the impression that he needed the money, or at least the greater part thereof, in order to effect a settlement. Then after having obtained possession of the money primarily for that purpose, he acknowledged receipt thereof as compensation for his professional services.

We have not overlooked the penultimate paragraph of the receipt. It may be conceded that the document is a restatement from a different angle of what might be the outcome of the understanding between Ruiz de Val and his client. Nevertheless, it clearly revealed to the client for the first time an aspect of that understanding that may have been uppermost in the mind of Ruiz de Val from the beginning, but, if so, had been kept in the background.

The least that can be said of the transaction as a whole is that it has none of the salient features, none of the open fairness, frankness, straightforwardness, directness and sincerity of purpose that should characterize the attitude of an attorney in dealing with his client.

On March 1st, 1928, Ruiz de Val received from Mrs. Riefkohl $2,000 for which he gave the following receipt:

"Jose Ruiz de Val,
Attorney and Notary,
6 Pedro J. Arsuaga St.,
Box 237, Tel. 71, Río Piedras, P. R.

"Received from Lucía Morales, widow of Riefkohl, two thousand dollars to be invested in a first mortgage at one per cent on 38 acres of land belonging to Mr. León Esquilín in the ward of Frailes of Guaynabo, Puerto Rico.

"Río Piedras, March 1, 1928.

(Signed)     José Ruiz de Val."

A few days later, Ruiz de Val presented to Mrs. Riefkohl for her signature the draft of a mortgage to be executed in her favor by León Esquilín, which she signed as mortgagee. The contemplated mortgage was never executed by León Esquilín. Later, however, he conveyed to Ruiz de Val the property which was to have been mortgaged.

Mrs. Riefkohl issued and delivered to Ruiz de Val monthly receipts in which she acknowledged the payment of interest in monthly installments by León Esquilín. On June 30, Ruiz

de Val, who was then in Paris, addressed to Tomás Morales a letter, which contained the following paragraph:

"In order to avoid the trouble of collecting interest from Esquilín, I have written my brother-in-law, Enrique García, and directed him to send the amount by draft to Chía."

Ruiz de Val says that when he offered Esquilín the money, Esquilín, who was already indebted to Ruiz de Val, said that if he should assume this additional obligation it would only aggravate his financial condition and that he preferred to sell to Ruiz de Val; that Mrs. Riefkohl had known from the beginning that witness wanted to buy the property; that witness had taken the data for the draft of the proposed mortgage from a citation by publication (*edicto*) in a dominion title proceeding instituted by another attorney in behalf of Esquilín; that later witness learned that the title had not been recorded in the registry of property; that witness on different occasions had explained the situation to Mrs. Riefkohl; that at the beginning of the negotiations witness had offered his note and had jokingly suggested the names of Cautiño or Don Manuel González as sureties, and the response was, "Your guaranty is enough, Ruiz de Val, you give him the money and assume the responsibility"; that Mrs. Riefkohl knew witness to be solvent; that witness had fifty thousand dollars invested in a certain property in Río Piedras, which was not encumbered; that witness also owned about two hundred acres of land, and his credit at the bank was good; that Mrs. Morales knew these properties and knew that a simple receipt or a promissory note signed by witness was better security than thirty-seven or thirty-eight acres, (*cuerdas*) of land; that later when Esquilín became seriously ill, he executed or acknowledged before a notary a certain document; that from the beginning it was practically understood between witness and Mrs. Riefkohl that witness intended to acquire the property and that the money was turned over to witness in order to facilitate such acquisition; that witness paid the interest by checks from the time of the first install-

ment and took receipts in the name of Esquilín; that Mrs. Riefkohl knew that the mortgage had never been executed; that on one occasion when she complained of the failure of other debtors to meet their obligations and mentioned her need of money, witness told her that the two thousand dollars was at her disposition, assuring her that witness, if necessary, could obtain the money elsewhere at a lower rate of interest; that this occurred in September after the return of witness from abroad; that some months later, when the break occurred and a demand was made for the return of the $5,000, Tomás Morales reminded witness that he, Morales, had the Esquilín receipt, and could use it at any time in order to make it appear that the money was to be secured by mortgage, and that witness told Morales that they could do as they pleased.

Ruiz de Val also says that he lent Esquilín the money in March, before sailing in May; that a provisional document, a promissory note secured by certain collateral was executed, and that this document was subscribed before the notary, Ramón Rodríguez Flores. A certificate was then introduced in evidence. It follows:

"I HEREBY CERTIFY: That in the Registry of Affidavits under my custody there appears the following declaration: Affidavit No. 6310. —SIX THOUSAND THREE HUNDRED TEN.—Río Piedras, July 17, 1929.— (6310) León Esquilín, of age, widower, property owner and resident of Río Piedras, acknowledges and ratifies his signature placed on a document of liquidation and sale executed on April 3, 1928, which said document relates to José Ruiz de Val, of age, married to Amalia García Ubarri, property owner, and attorney of the same place, and purports a transfer to him of a rural property situated in the ward of Monacillos of Río Piedras (the ward in which a part of the farm is situated being known also as Los Frailes) of 38.50 acres (*cuerdas*), more or less, bounded on the north by José Ruiz de Val; on the south by Isabel Milian and Successors of Laborda; on the east by Hernáiz, Alegría, and Heirs of Pérez Brothers; and on the west by José Ruiz de Val and Gervasio Solís.—Río Piedras, Puerto Rico, the 12th, day of December, 1930.—(Sgd.) Ramón H. Rodríguez Flores, notary public of Puerto Rico. (Seal of the notary.)"

The promissory note, if executed by Esquilín and unpaid, or the document referred to by the notary as a liquidation of account and purchase, would have been much more to the point. On cross-examination Ruiz de Val explained, however, that at the time of the liquidation of account and purchase, Esquilín was unable to deliver possession because of certain growing crops, one of which was sugar cane, and it was agreed that Esquilín would pay the interest of the $2,000 in lieu of rental during the current grinding season.

According to Mrs. Riefkohl and Tomás Morales, Ruiz de Val did not disclose the fact that the mortgage had never been executed until almost a year had elapsed from the date of the transaction. They say that they advanced the money for revenue stamps and made frequent inquiries with a view of obtaining a copy of the mortgage; that Ruiz de Val put them off with various excuses and on several occasions told them that the instrument had been presented in the registry of property. Mrs. Riefkohl says that he finally admitted that he had kept the money and offered her his promissory note for the amount. Ruiz de Val does not say that he delivered the $2,000 to Esquilín without any documentary evidence of such delivery, nor is it at all probable that he did so. If Esquilín in fact received the money, the documentary evidence of that fact should have been produced, or else the failure to produce the same should have been explained. The situation in which Ruiz de Val was placed by the testimony of Mrs. Riefkohl and of Tomás Morales, corroborated in part by the receipt of March 1st, 1928, by the instrument prepared and submitted to Mrs. Riefkohl for her signature, and by the letter from Paris, demands something more than a notarial certificate as to the existence of a settlement of account between Esquilín and Ruiz de Val in corroboration of the latter's testimony.

We have no reason to doubt that Ruiz de Val was financially responsible and that the $2,000 was quite as safe in his hands as it would have been if secured by a mortgage on

the Esquilín property. Probably Mrs. Riefkohl would have been quite content to accept Ruiz de Val's promissory note instead of a mortgage if the offer had been made (as he says it was made) in March or April of 1928, accompanied by a frank disclosure of the new arrangement and settlement with Esquilín instead of being made, as Mrs. Riefkohl says it was, almost a year later. There was no intention on the part of the attorney to defraud his client. He should not have deceived her, however, by concealing from her the turn that his negotiations with Esquilín had taken and thus leaving her under the impression that the mortgage had been executed as originally contemplated. The nature of the relationship existing between attorney and client is such that the deception of the client by the attorney can not be excused upon the ground that no pecuniary loss to the client was probable or in fact resulted from such deception.

Because of misconduct in connection with the three matters discussed above, Ruiz de Val will be suspended from the practice of his profession as a lawyer and as a notary public for a period of two years.